Mr. Justice O’Neall,
delivered the opinion of the court.
The plaintiffs’ first and fourth grounds, present the question,whether the judge below erred in refusing to permit the plaintiffs to give in evidence, two papers signed by the defendants, after the case had been closed, on one day, and adjourned over to the next for argument. We are unanimously of opinion, that in this respect the judge did not err, and that his discretion was strictly exercised according to “ the settled usages of courts of justice.” The bur-then of complaint in the first ground, is, that the judge did not require an affidavit from the defendants, that the introduction of the testimony would “ operate as a surpriseThe judge below, after an experience of more than forty years, at the bar and on the bench, has said, that he had “ never known an affidavit in such a conjunction demanded of the opposite counsel.” The circumstance, that in sueh a lapse of time, no such a demand had been made, is in itself evidence that no such right existed. But independent of well settled practice, which makes the “ usages of courts of justice,”' appealed to by the counsel for the motion, the call on the part of the plaintiffs, that the defendants should resist the introduction of the proposed evidence by an affidavit, is without the slightest pretence of reason or authority to sustain it. The plaintiffs, not the defendants, were asking for favor : they were applying to be permitted to do that which they were by law forbidden to do, save by leave of the court. The application was to the legal discretion of the court. If, as was said in Browning vs. Huff, 2d Bailey, 179, the introduction of the evidence would work either surprize, delay, or loss,to the defendants, it was the-duty of the court not to allow it to be given. The tendency of the proposed evidence could be seen and judged of by the judge, without an affidavit from the defendants. It was true it was written evidence which was offered: but it was *226 not like that in Browning vs. Huff, a part of the plaintiff’s title, and of which the record gave the defendant’s notice. From the explanations given here, by the plaintiff’s counsel of his proposed evidence, we can very readily discover, that its introduction would have led, in all probability, to a protracted examination of further parol proof, and would have introduced all the mischiefs against which, the decision in Jenkins ads. Price, 1 ISott and M’Cord, 153, was intended to guard.
Upon the second ground, I have to remark, that the consignment to Boyce & Henry, was not for the plaintiffs ; it was for the purchasers of the coffee, J. & T. Robson, and by their direction. How this could make Boyce & Henry, the agents of the plaintiffs, I do not perceive ; they were the agents of J. & T. Robson alone; for them they received the coffee. There was no stipulation that the plaintiff's were to be paid out of it. They purchased for the Robsons, relying on their ability to pay, as guaranteed by Mr. Ed-mondston, for indemnity. They did not even look to the defendants for payments ; for in their letter to Edmondston, speaking of the purchase of the coffee, and of the stipulation that they should draw for the amount, on Messrs. Goodhue &; Co. of New York, they say, “ Mr. Robson or his friends, remitting the money to those gentlemen, to meet our drafts.” At the time they wrote this letter, they knew the coffee was to be consigned to Boyce & Henry, for they in it, so state the fact. If the defendants duty arising out of the consignment had been, to act as the plaintiff* ageut in this matter, it certainly would have given them the right to claim payment for the coffee and remit it to the plaintiffs ; but instead of this, “ Mr. Hobson or his friends," in payment of the amount due for the coffee, are to remit funds to cover the plaintiffs drafts on Messrs. Goodhue & Co. It is true that the plaintiffs had the right of stoppage in transitu: but after the goods were delivered they had no lieu on them for the price. When the coffee was delivered to the defendants it was a legal delivery to J. & T. Robson. For the defendants were their agents to receive the coffee, not the plaintiffs’ agents to deliver it. There can, therefore, in this respect be no ground in fact or law to charge the defendants; and the judge below was perfectly correct when he said to the jury that the defendants “ incurred” thereby “ no legal responsibility to the plaintiffs.”
Under the third ground, it is assumed, first, that the defendants agreed verbally to indemnify Edmondston on account of his letter of credit in fayor of the Robsons, and that in consequence of this *227 ultimate liability over, that they should at once respond t® the plaintiffs in damages. This is susceptible of two answers; the contingency on which the defendants liability was to attach has not taken place. Edmondslon was not liable ; the plaintiffs discharged him by neglecting to give him notice that they had changed, by the consent of the Robsons, the manner of payment. If Edmondston is not liable to the plaintiffs, it would be absurd to say that the defendants, whose liability at most was to indemnify him, could be primarily liable to the plaintiffs. The second answer is equally satisfac. tory, a verbal guarauty since the statute of frauds has never been supposed to impose any legal liability. But it is said under the third ground, that the defendants undertook “ to remit the funds, and were bound to do so skilfully and faithfully.” Let this be conceded. The facts must test their liability under this concession. They bought a bill, good at the time of the purchase, and remitted it ac. cording to the directions of the Robsons and of the plaintiffs; there is no evidence that the course of trade demanded that the bill should be indorsed. Without such evidence, how can it be pretended that the defendants did not “ remit the funds skilfully and faithfully 1” It is true that the bill was paid for by the defendants, by Weyman’s draft: this might then have been doubtful paper ; but that could not affect the question, for if the bill bought waa good, it was the defendants good fortune to fairly obtain value for that which was doubtful. But I think the explanation given bjr Clough, shows that W eyman’s draft was to him as good as gold. Weyman had consigned cotton to his house, the proceeds of which he and his co-partners, would have in their hands to pay the very draft, which the defendants transferred to him. Until , the cotton was sold, and the proceeds realized, he might need the money, and hence it was that with the defendants as his indorsers, he discounted Weyman’s draft at the United States Bank. If his house had not failed, out of the proceeds of Weyman’s cotton, he, and not the defendants, would have paid the draft.
In vindication of the judge below, I have thought it necessary to say so much ; for the decision of the case it was wholly unnecessary. For it was a mere matter of fact submitted to the jury by a judge, (who never took a fact from the jury, box which be. longed to it,) with his opinion upon the facts, which he was bound to express to them, that the plaintiffs had not made out a case, which entitled them to a verdict. If under such circumstances the plaintiffs could get a new trial, no verdict could afterwards be al *228 lowed to stand, where either party asked to have it set aside. The jpotion is dismissed;
JOHN B. O’NEALL.
"We concur,
RICHARD GANTT,
JOSIAII J. EVANS,
I think the plaintiffs should have had a new trial.
A. P. BUTLER.
The opinion of
Mr. Justice Richardson.
The action of Drake and Mitchell, depends upon two considerations.
It alleges:
1. That Boyce & Henry, were the agents of Drake & Mitchell, in purchasing a bill of £4000, on London. But, either from want of skill, or negligence, failed to precure the usual securities. And, the bill having been unpaid, they became liable.
2. That, whether Boyce & Henry were, or were not the agents Of Drake & Mitchell — still, as they did in fact, purchase the bill, but used the occasion, to purchase an unsafe bill, in exchange for doubtful paper then lying on their hands — they, thereby, broke the faith, that the law requires in such transactions, and made money for themselves. And this renders them, still liable for the loss that followed ; or at least, to the extent of their own gains.
Unskilfullness in the one case, and bad faith in either case, are the predicates of the action. The rules of law, that apply to the case are plain.
Any aberration for a selfish purpose, in the execution of a colt" fidential and discretionary trust, constitutes the bad faith ; whieh, renders a man responsible for loss in such cases. There may have been no moral fraud whatever, and yet the party may be holden clearly liable. For instance, any man may purchase up judgments at 50 por cent, discount, and be safe in his bargain ; and yet, if a lawyer, were to purchase of his own client, one of the judgments of which he had the management, at 20 per cent, discount, in ninety.nine eases out of an hundred, he would be compelled to refund the 20 per cent.
It is the confidential relation of the parties, that makes the difference ; and moral turpitude does not of necessity, enter into the charge. I lay down this principle at the outset; because my opinion, in one respecc, turns upon the application of this general distinction. It is the fundamental principle of the case, as presented to us by the evidence.
If Drake & Mitchell adduced any evidence that the defendant*. Were agents, or, (whether agents or not,) any evidence that they *229 committed such a fraud, as I have defined, then the court ought to have left the questions — of agency, or not — or of fraud, or no fraud — entirely to the jury, with an explanation of the law as is applied to both questions. For if the jury, contrary to the opinion of the court, would have verified the agency and the fraud, they might have found for the plaintiffs.
Now the charge of error in the judge, is this, 1. That he did not leave the question of agency to the jury But in his charge took it for granted, ‘that Boyce & Henry, were not the agents of Drake & Mitchell; and upon this assumption, instructed the jury, that Boyce & Henry had incurred no legal responsibility.
2. That still assuming that there was no proof of the agency, the judge instructed the jury, that Boyce & Henry liad incurred no legal responsibility, without instructing them, that if the jury thought the defendants had committed no fraud, then it was, that there was no legal responsibility.
The report of th® judge’s charge is as follows :
“ I considered, and so stated to the jury, that Boyce & Henry, acted in the capacity of agents, merely, for the house of J. & T. Robson ; that in point of privity, they were in no way concerned in the contract between Drake & Mitchell and the Robsons ; the terms of which contract, required that the consignment should be made to Boyce & Henry, ot Charleston, and under which no legal responsibility was incurred by them, to the house of Drake <Ss Mitchell; neither did I think the non-payment of the bill of exchange, which had been drawn on the firm of Clough &; Company, and the failure of that house, placed them in a situation of responsibility to Drake & Mitchell.
“ Acting as they had done, not in their own right, but as the agents of the Robsons, and in pursuance of their orders ; and having used ordinary discretion in obtaining the bill of exchange, from a house of unquestionable credit at the time, the subsequent failure of th® house created no liability on them.”
“ And under which [contract] no legal responsibility was incurred.” Assuredly correct law ; after the fact, that there was n© agency, had been verified by the jury, &c. “ Neither did the nonpayment of the bill, place defendants in a situation of responsibility.” Very correct law, if the charge of fraud, were first negatived by the jury.
Now then, the question to be decided is, Did the judge in this charge, assume the fact, that Boyce & Henry were not the agents of Drake & Mitchell, or, the fact, that there was no fraud, instead of leaving these questions of fact, entirely for the decision of the jury ; and letting them understand, that it was only in case they should first find those facts in favor of Boyce & Henry, they were, to hold the defendants legally irresponsible.
The fair construotion of the charge as reported, is, that those feote are impliedly assumed, and that th® jury were not instructed, *230 to decide for themselves, whether there was any agency between the plaintiffs and the defendants, or, whether, any fraud had been committed ; or that these facts must be resolved in favor of Boyce & Henry, before the law, that they were not legally responsible, could apply to the case. The law depended, upon the previous con-elusion of the jury, from the evidence. If they found that there had been no agency between plaintiffs and defendants, the defendants could not be legally responsible, for unskilful] ness in the procuring the bill, unless there was a fraud. If they found no fraud, as well as no agency, the defendants could not be legally responsible. The inadvertance to the fact of agency, or of fraud, might very readily occur in such a case, the proofs being merely circumstantial. But if there was any competent evidence, that went to prove the agency between the plaintiffs and defendants, or any evidence of a fraud, then the plaintiffs had a legal right, to have the question of such agency, or the question of fraud, submitted to the jury, for their exclusive determination, before the law could apply.
If I am correct in these premises, the case is narrowed down to this inquiry, Was there any evidence of the agency of Boyce & Henry ? or of the fraud ? If either, there has been an oversight in the charge, which the plaintiffs may claim advantage of.
What are the proofs of the supposed agency? They consisted, 1st. In the fact, that Boyce & Efenry accepted the consignment of the coffee, from Drake & Mitchell; shipped, it is true, for the Rob-sons ; but with the evident confidence, that the consignees would secure the price of the coffee, by transmitting funds to New York, to meet the bills of Drake & Mitchell, drawn for the original price of the coffee.
“Invoice of coffee,” &c. &c. “to be forwarded, with advice of drafts, to the care of Boyce & Henry,” says Robson, in his let-tor of 28th April, 1825, to Drake & Mitchell.
In the letter of Drake & Mitchell, of 20th of May, 1825, they address themselves to Boyce & Henry, evidently, as persons having authority to change the manner of payment by bills ; and make no reference to the Robsons, &c. “We are about, (they say,) to value on our friends Messrs. Campbell, Bowden & Co., to be covered by you, on Messrs. Goodhue & Co. as you may direct.” And at the conclusion, they say, “ we trust that these dispositions will meet your approbation.” Not a word is said about the Rob. sons. And the entire correspondence of Drake & Mitchell, is in the same style, after the letter of the 20th May, 1825.
This letter was sent to the Robsons for their approbation, &c. But that was gratuitous, and scarcely lessens the indication, that Boyce & Henry deemed themselves, also the agents of Drake & Mitchell. On the other hand, the defendants gave no notice to Edmondston, whom they had counter-guaranteed ; which omission would seem clearly to indicate, that in buying the bill of £4,000, upon London, the defendants acted upon their own responsibility. It was an omission which absolved Edmondston, from his letter of *231 credit in favor of the Robsons; and of course also absolved Boyce & Henry, consequently from their counter-guaranty to Edmondston.
Now I ask, how cculd Boyce & Henry, when they well knew, that Edmondston had guaranteed Drake & Mitchell, omit to notify Edmondston of a change, so important as to absolve him, and of course, themselves too ; and yet not indicate, by their omission, that they were conscious of a new state of the negoeiation, which brought their former responsibility to Edmondston, directly home to Drake & Mitchell.
The evidence I have noted may be inconclusive proofs of an agency between the defendants and Drake & Mitchell; but they are circumstantial facts, that go to indicate agency, and are worthy of consideration.
The import and weight of such facts may be easily overlooked in the hurry of a trial; but a man may pause, and ask, with some reason, Was nobody put in the plabe of Edmondston, when he was thus, in effect discharged, by the omission of bis own counter, guarantees — the avowed agents of the Robsons, and the consignees of the coffee ; and when the bill w.as purchased by them, under the authority of a letter, which is literally to them, and without reference to other persons?
It may be asked, why did not Drake & Mitchell, notify Ed-mondston, of the proposed change in the mode of payment? Assuredly, they ought to have done so, when the proposition was made. And so ought the Robsons, or Boyce & Henry, to have done before they accepted and executed it. But the omission, by all, to notify Edmondston, only increases the indication, that former guarantees were given up ; and that the new mode of payment by a bill on London, was to stand upon its own basis, and may therefore, imply a direct agency in Boyce & Henry, under the letter of the 26th May.
In a word, are such acts, no proof at all of such an agency ? Is it certain that Drake & Mitchell could not have anticipated, when they changed the manner of payment, that they renounced both the liability of the Robsons, and Edmondston too, upon their reliance on the safe house of Boyce & Henry, who had in hands the coffee, to insure their own safety, in facing the bills of Drake & Mitchell.
For my own part, I would say, that when Drake & Mitchell broke tlie contract with Edmondston, which is now verified by the decision in the case of Drake & Mitchell against Edmondston, they also broke it with the Robsons. This would have been obvious, but for the voluntary notice, given by Boyce & Henry to Robson, which be it remembered, was not directed to be done by Drake & Mitchell, but is the gratuitous act of Boyce & Henry. Drake & Mitchell corresponded on the subject of the bill for £4,000, with Boyce & Henry alone, and asked for their own approbation.
Now I ask, if this be the position of Drake & Mitchell, are they not to have the advantage of the new contract, as well as the disadvantage of breaking the former contract. If they broke it for the advantage of a bill on London, ought they not to have all *232 the advantage of this new contract. Is this view incompetent in law ? Must not all the facts which lead to such a possible conclusion, be resolved by a jury 1
Now under this aspect, is it not enough, at least, for referring the facts to a jury to say, that by the letter of 26th May, Drake &. Mitchell requested Boyce <fe Henry, to purchase the hill of £4,000 ; that they undertook the business and the loss followed. Is not the simple fact, of doing the business, the usual proof of agency, until explained away 1 Admit that it was explained away,in our judgments, still is the explanatory proof to be taken for granted, and not to be left to the jury!
But the other day, we ordered a new trial, in M’Ginnes vs. "Wallace, because, although the gift of the negro to an infant child, reserving a life estate, was utterly void ; yet, as the reservation of the life estate, in these words, “ But my daughter, you must let grand-father keep the negro for his life,” might possibly be construed by a jury, to bo a mere asking desire of the child, that the donor might still keep the negro. And the new trial was most justly ordered, because the evidence, however slight, in the understanding of the judge, must be weighed by the jury. In all such cases the trial must be by the jury ; and the law must be put hypothetically. It depends upon what facts the juty shall first verify, and not upon taking the facts, as if already verified.
I can account in no other way, for the entire silence of Drake & Mitchell, in never referring to Robson, or Edmondston, but by supposing that they felt sufficiently secure by the agency of Boyce & Henry. And this confidence, may with reason have been settled, by the fact, that Boyce & Henry, were the ultimate guarantees of Edmondston ; and of course, the new agency, by purchasing the bill for £4,000, did no more than bring their former express responsibility to Edmondston, directly to Drake & Mitchell.
And may it not be equally probable, that Boyce & Henry, undertook the unqualified agency of purchasing the bill of £4,000, knowing, that they were at all events, liable to Edmondston ; and inasmuch as they could be no more than liable, directly to Drake & Mitchell, by such agency.
This view accounts for the total omission by all parties, to give notice to Edmondston, and for Boyce & Henry’s accepting of an agency ; in which, no other persons are alluded to, as their principals. It also accounts for the entire correspondence of Drake & Mitchell, being carried on in tire same style.
The single fact, that goes to rebut this interpretation of the cor- • respondence between the plaintiffs and the defendants,is, that Boyce & Henry did refer the letter of Drake &. Mitchell, of the 26th May, to the Robsons for their approbation ; but there were relations between these parties, that made such notice prudent; and Boyce & Iicnry may not have chosen to give up the personal responsibility of the Robsons ; in addition to the security of the coffee in their hands.
The next point is, whether the charge of a fraud, also had no evidence to support it. This charge chiefly consists, i» the apparent *233 anxiety of Boyce to get rid of Woyman’s bill: In the fact, which may be reasonably supposed that that bill was the defendants property, until the contrary is shewn, and the large indebtedness of' Weyman to them, which would seem to account for their anxiety; and might make the defendants interested to get any of Weyman’s bills off their hands. And then follows the actual failure of Wey-man, soon after. These are, in my mind, scarcely to be called indications of moral fraud. But where any man, having power to act at discretion, brings loss to his employer, and at the sometime, and in the same act, brings gain to himself, very slight proofs of batí faith, or selfish conduct, constitute good cause for his liability, at, least to the extent of his gains.
It is a great and established principle, in all agencies, that the agent is not to make gain inditectly, at the expei-se or hazard of his principal. His power and knowledge give him great facility in abusing his trust; and he must, therefore, keep himself aloof from even the appearance of selfish conduct,
A factor might, very honestly, debit himself to-day, with all the cotton in his hands at 17 cento, and yet if cotton should rise in the course of three days to 25 cents, and he should sell it, and gain 7 cents in the pound, he would most likely bo made to refund all his gains. Simply because the example would be pernicious and lead to great frauds.
Now slight as are the indications of moral fraud, on the part of Boyce & Kemy, yet the simple fact, is, that they did purchase a bill of dS4,00Q, for Brake & Mitchell; that they had in their hands perfect security in the coffee. That they did realize by the exchange of Weyman’s paper, for Clough’s bill, the payment of a doubtful and eventually, a bad bill of Weyman’s.
Apply to these facts the principle I have just noticed, and then ask the question, Is there no proof, whatever, of that kind of selfish conduct, which may make a man liable in such cases ; although it may not amount to moral turpitude.
Men acting in such cases, for others, must be as disinterested as jurors, or they may be mado legally responsible. It is not necessary to charge them with foul machinations. And this is what, as I understood, the counsel avoided, not that they gave up the very principle and gist of their case, which consisted, in the bad faith, of buying a bill for Drake & Mitchell, with a view to their own pecuniary interest.
It is true that eventually, Boyce & Henry had to pay Wey-man’s bill; but this happened by their afterwards accommodating Clough, with their indorsement.
But take any view — ought not so important a question of fact to have been submitted to the jury, upon the circumstantial proofs, that entered into the transaction. Are they so slight, that tho negative may be taken for granted. Are they incompetent to bring into action the great principle of preventive policy, I have just noticed, and which applies to every case, in which otic acts for another with large discretionary powers, and uses them for any selfish purposes whatever?
Hunt and Kins, for the motion.
Petigku and Dunkin, contra.
Filed 22d Feb. 1837.
What rendered Major Haskill liable, and why was he compelled to restore to the heirs of Miss Butler, the estate he had purchased from them; while Major Hart and Mr. Darby, who did precisely the same thing, were holden irresponsible by the same judges. (D’s. Equity Reports.) It was not, that Haskill committed a fraud. But simply, because he was the agent for the heirs, w hen he purchased of them. The example was pernicious. This principle lies at the bottom of all those cases, in which trustees, representatives, and all agents de facto■ am held to strict accountability. They must not speculate for their owu gains. The law calls it bad faith ; and treats the misuse of their power, if money bet made out of it, as it would positive fraud.
The evidence in the case now before us, brings it within the same principle. The fact that Boyce & Henry did purchase a bad' bill, and did by the purchase realize the payment of the bad paper of Weyman, puts the case there, for the purpose of weighing the facts as well as the law. And the fact, that they did purchase the ■bill of £4,000, under the authority of Drake & Mitchell’s letter of 26th May, which does not in its terms indicate any other principal, but themselves, carries the question of agency, or not, to the jury.
J. S. RICHARDSON.